**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| CHRISTOPHER A. FEDUCCIA,<br><br>Plaintiff,<br>v.<br><br>I.C.E. SERVICES, INC., *et al.*,<br><br>Defendants. | Case No. 3:24-cv-00276-SLG |

**<u>ORDER ON SECOND MOTION TO DISMISS</u>**

Before the Court at Docket 54 is Defendants' Motion to Dismiss Relator's Amended Complaint. The motion has been fully briefed.[1] Thomas J. Bourdon and I.C.E. Services, Inc. ("I.C.E.") (collectively, "Defendants") assert that the Amended Complaint should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).[2] Oral argument was held on June 10, 2026.[3]

**BACKGROUND**

The Court presumes familiarity with the facts as set forth in the Court's previous order on Defendants' first motion to dismiss,[4] which are summarized as follows:

[1] Docket 54; Docket 57; Docket 60.

[2] Docket 54-1 at 6, 9. This order cites to the Amended Complaint filed at Docket 50. A sealed version of the Amended Complaint is filed at Docket 66 with attached sealed exhibits. The Court cites to the sealed exhibits filed at Docket 66 for those exhibits for which a placeholder coversheet was filed with the Amended Complaint at Docket 50.

[3] Docket 67.

[4] *See* Docket 49 at 3-8.

In the wake of the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.[5] Section 1102 of that Act amended the Small Business Act, 15 U.S.C. § 631 *et seq.*, by creating the Paycheck Protection Program ("PPP"), a program providing forgivable loans to help small businesses keep their employees on their payroll during the COVID-19 pandemic.[6] A business seeking a PPP loan from the Small Business Administration ("SBA") had to certify in good faith "that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient" and "that [PPP] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments."[7] The PPP Borrower Application form also included a requirement that the applicant certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant" and a certification that "the information provided in [the] application and the information provided in all supporting documents and forms is true and accurate in all material respects."[8]

---

[5] Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified at 15 U.S.C. § 9001 *et seq.*).

[6] Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (2020) (codified at 15 U.S.C. § 636(a)(36)).

[7] 15 U.S.C. § 636(a)(36)(G)(i)(I)-(II) (enacted by CARES Act § 1102(a)(2)).

[8] Docket 50 at ¶¶ 24, 30.

I.C.E. is a privately-owned corporation that "owns and operates remote workforce housing, catering, and related support facilities for oil and gas operators on Alaska's North Slope."[9] Mr. Bourdon, his spouse Deborah Bourdon, and I.C.E. Acquisition, Inc. own 25%, 26%, and 49% of I.C.E., respectively.[10] PT Arctic Fund I, LP holds shares of I.C.E. through I.C.E. Acquisition, Inc.[11] Defendants submitted a PPP loan application sometime between April 4 and April 10, 2020, that was approved on April 11, 2020; Defendants received a $5,682,490 loan disbursement on April 30, 2020.[12]

On June 15, 2021, Mr. Bourdon submitted I.C.E.'s PPP loan forgiveness application, which the SBA approved on July 22, 2021.[13]

On December 17, 2024, Relator Christopher Feduccia filed his original Complaint in this Court.[14]

On March 17, 2025, the United States notified the Court of its decision not to intervene in this action.[15]

---

[9] Docket 50 at ¶ 32; *see also* Docket 50 at ¶ 34 ("[D]emand for services that house and support North Slope workers, including remote camps and catering, has historically followed the continuity of field operations rather than short-term price movements (that might be caused by a pandemic).").

[10] Docket 66-9 at 1.

[11] Docket 66-3 at 47.

[12] Docket 50 at ¶¶ 112-14.

[13] Docket 50 at ¶¶ 117-18; Docket 66-9 at 3.

[14] Docket 1.

[15] Docket 12.

On April 22, 2025, Defendants filed their first motion to dismiss.[16] On November 21, 2025, the Court granted the motion but accorded Relator leave to file an amended complaint as to Counts 1, 2, and 4.[17]

On December 16, 2025, Relator filed an Amended Complaint, which alleges three counts.[18] Count 1 alleges that both Defendants submitted false claims in their PPP loan application in violation of 31 U.S.C. § 3729(a)(1)(A).[19] Count 2 alleges that both Defendants created a false record or statement material to a false claim in their PPP loan application in violation of 31 U.S.C. § 3729(a)(1)(B).[20] Count 3 alleges that I.C.E. violated 31 U.S.C. § 3729(a)(1)(G) "by failing to repay or refund the monies received" from the United States in the PPP loan.[21]

## LEGAL STANDARDS

### I. Rule 12(b)(6) and Rule 8(a)

Under Federal Rule of Civil Procedure 8(a), a complaint must contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to

---

[16] Docket 17.

[17] Docket 49 at 23. Count 3 of the original Complaint, conspiracy to violate the FCA, was dismissed with Relator's concurrence. Docket 49 at 11 n.55.

[18] Docket 50.

[19] Docket 50 at ¶¶ 123-31.

[20] Docket 50 at ¶¶ 132-39.

[21] Docket 50 at ¶ 145; *see generally* Docket 50 at ¶¶ 140-48.

relief."[22] If a complaint fails to do so, the defendant may move to dismiss it under Rule 12(b)(6).[23]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[24] A plaintiff is not required to prove his case in the complaint, but a complaint, including an FCA complaint, "must state 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged].'"[25] A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[26]

## II. Rule 9(b)

"Because they involve allegations of fraud, *qui tam* actions under the FCA must meet not only the requirement of Rule 8, but also the particularity requirements of Rule 9."[27] Rule 9(b) requires that "[i]n alleging fraud or mistake, a

---

[22] Fed. R. Civ. P. 8(a)(2).

[23] Fed. R. Civ. P. 12(b)(6).

[24] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[25] *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alterations in original) (quoting *Twombly*, 550 U.S. at 556) (holding that FCA claims "must, in addition to pleading with particularity, also plead plausible allegations").

[26] *Iqbal*, 556 U.S. at 678.

[27] *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).

party must state with particularity the circumstances constituting fraud or mistake."[28] But the rule also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[29] And "[a]llegations of fraud based on information and belief" may satisfy the particularity requirement "if the allegations are accompanied by a statement of the facts upon which the belief is founded."[30]

## DISCUSSION

Defendants assert that Counts 1, 2, and 3 of the Amended Complaint should each be dismissed without leave to amend.[31] The Court first addresses Counts 1 and 2, and then considers Count 3.

### I. Count 1 (Submission of False Claims) and Count 2 (Creation of a False Record or Statement Material to a False Claim)

"To make out an FCA claim, a qui tam relator must allege '(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"[32]

---

[28] Fed. R. Civ. P. 9(b).

[29] *Id.*

[30] *Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds as stated in Flood v. Miller*, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

[31] Docket 54-1 at 9, 40.

[32] *United States ex rel. Relator, LLC v. Erskine*, 182 F.4th 785, 791 (9th Cir. 2026) (quoting *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017)).

Defendants assert that Counts 1 and 2 of the Amended Complaint fail to sufficiently allege element one, a false statement; element two, scienter; and element three, materiality.[33]

**a. Element One: False Statement**

In the prior order granting Defendants' first motion to dismiss, the Court found that "[n]either Count 1 nor Count 2 clearly alleges that it is the economic uncertainty certification and the accuracy of the economic uncertainty certification on the April 2020 PPP loan application that form the bases of each claim. Rather, [Count 1 and Count 2] broadly provide a formulaic recitation of the elements of the respective claims, stating that Defendants made unspecified false statements or representations on unspecified applications."[34]

Relator's Amended Complaint makes clear that the economic uncertainty certification in Defendants' PPP loan application is the alleged false statement.[35] In this second motion to dismiss, Defendants assert that the allegations in the

[33] Docket 54-1 at 17 ("Here, Relator's Amended Complaint has failed to allege with particularity the falsity of the statement that forms the basis of his FCA claims, and that *Defendants*, not Pt Arctic Fund or Pt Capital, had the required scienter at the time the PPP loan application was submitted in April 2020. Additionally, Relator's conclusory allegations that the government relied upon the 'economic uncertainty' check-box certification is both incorrect and insufficient to meet the demanding standard of 'materiality' for a FCA claim.") (emphasis in original).

[34] Docket 49 at 13.

[35] Docket 50 at ¶¶ 126, 134; *see also* Docket 54-1 at 17 ("Relator points to the following check-box certification on I.C.E. Services' PPP loan application as the basis for his FCA claims: '[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant[.]'").

Amended Complaint "are legally insufficient to establish the falsity of Defendants' 'economic uncertainty' certification at the time it was made."[36]

Paragraphs 51-71, 83, 86-103, and 118-122 of the Amended Complaint allege that I.C.E.'s first quarter of 2020 strong revenues, access to liquidity, and other financial metrics at the time of the PPP loan application indicate a lack of economic uncertainty.[37] Relator contends that Pt Arctic Fund's 2019 Annual Report, Mr. Hugh Short's March 18, 2020 investor update, and the organizational chart depicting the ownership structure between I.C.E. and its equity holders "provide a vivid and detailed portrait of an economically strong company with access to significant institutional, internal and personal capital, which demonstrates the falsity element of Relator's FCA claim."[38]

Defendants respond that "Relator attempts to deflect from the admissions contained in his own [original Complaint] by omitting from the Amended Complaint the previously-included key language from [the March 18, 2020 letter and 2019 Annual Report] which demonstrate the presence of economic uncertainty at the

---

[36] Docket 54-1 at 14.

[37] *See* Docket 50 at 14 ("I.C.E. Services' Pre-Pandemic Performance and Forward-Looking Expectations"), 17 ("I.C.E. Services' Access to Liquidity in April 2020"), 19 ("The $5.3 Million Recallable Distribution Relating to I.C.E. Services"), 23 ("I.C.E. Services Thrived During the Pandemic"), 30 ("How and Why the Certifications Were False").

[38] Docket 57 at 13-18; *see* Docket 50-1 (Organizational Chart); Docket 66-1 at 1-2 (March 18, 2020 letter); Docket 66-3 (2019 Annual Rep.) at 27-30, 47-49; Docket 66-4 (2020 Annual Rep.) at 15-16, 29-30.

time Defendants submitted the PPP loan."[39] While the omitted language is suggestive of economic uncertainty, Relator correctly notes that "'an amended complaint supersedes the original complaint' and renders the latter 'without legal effect.'"[40] Further, to the extent that Relator's Amended Complaint contradicts the original Complaint, the Ninth Circuit has held as follows:

> The short of it is that there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations. Unless there is a showing that the party acted in bad faith—a showing that can only be made after the party is given an opportunity to respond under the procedures of Rule 11—inconsistent allegations are simply not a basis for striking the pleading.[41]

But not only is this information suggestive of economic uncertainty in the original Complaint, it is also contained in documents attached to the Amended Complaint. At oral argument, the Court inquired about legal authority concerning "how a court should rely, or can rely on attachments to an amended complaint that are at odds . . . with the allegations in the complaint."[42] In supplemental briefing, Defendants cite four Ninth Circuit cases for the proposition that a court need not accept a complaint's conclusory allegations as true when they are contradicted by

---

[39] Docket 60 at 7.

[40] Docket 57 at 31 n.6 (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 927 (9th Cir. 2012) (en banc)).

[41] *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007).

[42] Docket 70 (Oral Arg. Tr.) at 14.

documents referred to in the complaint.[43] Relator responds that "Defendants ignore other cases that bar courts from weighing facts under Rule 12(b)(6)" and provides competing Ninth Circuit and district court authority for the proposition that a court must not weigh disputed evidence when ruling on a motion to dismiss.[44]

According to Defendants, "[t]hese specific statements about the economic hardships that existed at the time Defendants applied for the PPP loan dominate over Relator's general and conclusory statements that Defendants falsely certified to the presence of economic uncertainty."[45] Defendants point to paragraph 41 of the Amended Complaint, which "[h]ighlight[s] that I.C.E. Services' revenue in 2020 decreased from 2019"; paragraph 49 of the Amended Complaint, which "note[s] that Pt Arctic Fund advised its limited partners in a March 18, 2020 letter about COVID-19's impact on 'I.C.E. Services and other portfolio companies'"; and Exhibit B, the March 18, 2020 letter stating that "we could see drastic reductions in production as employees are kept at further distances. This could affect our

[43] Docket 68 (Defs.' Notice of Supp. Auth. in Resp. to Oral Arg. Question) at 1-2 (first citing *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115–16 (9th Cir. 2014); then citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998); then citing *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1136 (9th Cir. 2013); and then citing *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1006–07 (9th Cir. 2015)).

[44] Docket 69 (Relator's Resp. to Defs.' Notice of Supp. Auth. in Resp. to Oral Arg. Question) at 2-3 (first citing *Jones v. Johnson*, 781 F.2d 769, 772 n.1 (9th Cir. 1986); then citing *Lopez v. City of Sacramento*, Case No. CIV-S04-2009-MCE-PAN, 2005 WL 8176654, at *3 (E.D. Cal. Mar. 18, 2005); then citing *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); then citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); and then citing *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011)).

[45] Docket 54-1 at 30 (citing *Goulatte v. CitiMortgage, Inc.*, Case No. EDCV 12-391 PSG (SPx), 2013 WL 12132060, at *3 (C.D. Cal. Feb. 27, 2013)).

shorter-term contracts, but will not affect our longer term, fixed amount contracts."[46] In Defendants' view, these allegations demonstrate that "Relator has failed to sufficiently allege (and simply cannot satisfy) the element of falsity as it pertains to the 'economic uncertainty' certification."[47]

While Defendants are correct that these statements suggest I.C.E. was experiencing economic uncertainty in or around April 2020, Relator's Amended Complaint and its accompanying exhibits also contain many contrary allegations that suggest I.C.E. was not experiencing economic uncertainty.[48] Specifically, Relator has identified multiple sources of capital that I.C.E. had the ability to access to cover company operations in light of the COVID-19 pandemic. As alleged in the Amended Complaint, on December 31, 2019, I.C.E. "held approximately $4.5 million in cash and had full access to an undrawn $2 million line of credit, providing it with an estimated $6.5 million in available liquidity."[49] Further, Pt Arctic Fund's 2019 Annual Report, dated March 31, 2020, stated: "Management is currently revising the 2020 budget, based on discussions to date we do not anticipate ICE requiring a capital infusion."[50] And, in April 2020, the same month that Defendants

---

[46] Docket 54-1 at 18, 30 (citing Docket 50 at ¶¶ 41, 49; Docket 66-1 at 1-2).

[47] Docket 54-1 at 18.

[48] *See, e.g.*, Docket 50 at ¶ 51 ("During 2019, I.C.E. Services realized a significant increase in revenues.").

[49] Docket 50 at ¶¶ 60, 120(a); Docket 66-3 at 30.

[50] Docket 50 at ¶ 56; Docket 66-3 at 30.

made the alleged false certification on I.C.E.'s PPP loan application, "Pt Arctic Fund had reserve capital of $5.6 million and [capital available to invest] of $8.4 million."[51]

Defendants maintain that because Pt Arctic Fund's annual report contains multiple disclaimers, it is "unreliable, inexact and unsuitable for the legal purpose to which Relator seeks to use them."[52] But Defendants do not dispute the report's authenticity and for purposes of a motion to dismiss, the Court finds the report may be relied upon in determining whether Relator has adequately alleged falsity with particularity.

Defendants also assert that reliance on the Pt Arctic Fund's 2019 Annual Report is misplaced because that report was focused "on the alleged business performance of I.C.E. Services before the COVID-19 pandemic struck, and after its impact could be measured (as ameliorated by the PPP loan itself), but not at the moment of uncertainty when the loan application was submitted."[53]

For purposes of ruling on Defendants' second motion to dismiss, the Court has considered the statements in the Pt Arctic Fund's 2019 Annual Report. In *United Healthcare*, the Ninth Circuit held that a two-year span met Rule 9(b)'s

---

[51] Docket 50 at ¶ 65 (citing Docket 66-3 at 4).

[52] Docket 54-1 at 21 ("I.C.E. Services' financial performance both before and after the Covid-19 pandemic, especially many months or years before or after the PPP loan application was submitted, has no bearing on the veracity of Defendants' good faith certification made in April 2020.").

[53] Docket 54-1 at 21.

particularity standard for when allegedly fraudulent certifications were made.[54] Thus, the Court is not limited to considering only the factual allegations concerning the precise date that I.C.E. submitted its PPP application when evaluating I.C.E.'s Economic Necessity Certification.[55]

Although Defendants point to portions of the attachments to the Amended Complaint that could support a finding that I.C.E. faced economic uncertainty when it submitted its PPP application, the Amended Complaint contains plausible allegations of falsity with sufficient particularity to satisfy the requirements of Rules 8 and 9(b).[56] Relator has provided multiple allegations that for the years prior to, and during the COVID-19 pandemic, I.C.E. held significant liquid reserves and had access to additional liquidity, and that revenue performance remained strong prior to and during the COVID-19 pandemic.[57] In short, Relator's allegations that Defendants submitted the PPP application in spite of their allegedly strong

---

[54] *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1181 (9th Cir. 2016) (alleging falsity "[b]etween and during about 2005 and about 2007" and "[d]uring or after June 2008").

[55] *See id.* at 1180 ("Because this standard 'does not require absolute particularity or a recital of the evidence,' a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." (internal citations omitted)).

[56] *See, e.g.*, Docket 66-1 at 1-2 (March 18, 2020 letter stating that "[W]e could see drastic reductions in production as employees are kept at further distances. This could affect our shorter-term contracts, but will not affect our longer term, fixed amount contracts.").

[57] *See, e.g.*, Docket 50 at ¶ 60 ("At the close of 2019, I.C.E. Services held approximately $4.5 million in cash and had full access to an undrawn $2 million line of credit, providing it with an estimated $6.5 million in available liquidity. . . . This was in addition to the $5.3 million recallable distribution, discussed below, and the substantial personal resources of the Bourdons.").

Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") data,[58] resilient business model in the industry, and ability to access other sources of liquidity,[59] are sufficiently particular allegations of falsity to satisfy Rule 9(b).

#### b. Element Two: Scienter

The Amended Complaint alleges that Defendants saw, approved, or were aware of the contents of each of Pt Arctic Fund's annual reports and Mr. Short's March 18, 2020 letter regarding I.C.E.[60] Further, Relator alleges that Pt Arctic Fund "effectively owned" 49% of I.C.E. and held an option to acquire the remaining 51% ownership interest;[61] and Pt Capital's Chief Executive Officer ("CEO"), Mr. Short, served on I.C.E.'s Board.[62] As such, Relator asserts that Pt Arctic Fund's knowledge about I.C.E.'s financial condition should be imputed to Defendants.[63]

Relator also alleges that the SBA's affiliation regulations, "where entities are treated as affiliates whenever one controls, or has the power to control, the other,"

---

[58] *See* Docket 57 at 16 ("I.C.E.'s EBITDA, along with its $6.5 million liquidity and reduced net debt, provide strong evidence Defendants' Economic Necessity Certification was false.").

[59] *Ebeid ex rel. United States v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010) (rejecting " the district court's categorical approach that would . . . require a relator to identify representative examples of false claims to support every allegation.").

[60] Docket 50 at ¶¶ 46, 49; *see also* Docket 50 at ¶ 47 ("Pt Arctic Fund/Pt Capital and I.C.E. Services operated as a single, integrated economic enterprise for PPP affiliation purposes, such that Pt Capital and Pt Arctic Fund's knowledge of I.C.E. [Services'] financial condition and prospects is properly imputed to I.C.E. Services itself.").

[61] Docket 66-4 at 30.

[62] Docket 50 at ¶ 46 (citing Docket 66-1).

[63] Docket 50 at ¶ 46.

serve as a second basis for imputing knowledge to I.C.E. from Pt Arctic Fund.[64] And Relator alleges that I.C.E.'s financial and economic data in Pt Arctic Fund's annual reports were intended for its shareholders and "that data obviously originated" from I.C.E. or its accountants.[65]

Defendants assert that (1) the Amended Complaint contains no plausible allegations that Defendants knew I.C.E. was not facing economic uncertainty when the PPP loan application was submitted in April 2020; (2) Pt Arctic Fund's and Pt Capital's knowledge is insufficient to establish Defendants' scienter; and (3) the Amended Complaint lacks sufficient facts needed to impute knowledge from Pt Arctic Fund to Defendants.[66]

The FCA defines "knowingly" to mean that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."[67] The FCA does not require "proof of specific intent to defraud."[68] "The FCA's scienter element refers to respondents' knowledge and subjective beliefs—not to what an objectively reasonable person

---

[64] Docket 50 at ¶ 47 (citing 13 C.F.R. §§ 121.103(a)(1), 121.301(f)).

[65] Docket 50 at ¶ 48 ("No other entity or source could have originated said data. The most reasonable and plausible conclusion that makes sense is that I.C.E. Services (or its accountants) shared its own data with its owners, which included Pt Arctic Fund.").

[66] Docket 54-1 at 23-32.

[67] 31 U.S.C. § 3729(b)(1)(A).

[68] *Id.* § 3729(b)(1)(B).

may have known or believed."[69] For purposes of a motion to dismiss, "[a] complaint . . . must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred."[70] But unlike the "circumstances constituting fraud,"[71] intent and knowledge "may be alleged generally."[72]

Relator contends that Defendants' argument that they were not aware of or had any part in creating the Pt Arctic Fund's annual reports "reflects Defendants' total disregard of Amended Complaint allegations, reasonable inferences, and common sense."[73] According to Relator, the "Amended Complaint's allegations and inferences referencing I.C.E.'s financial information from the 2019 Annual Report, which obviously had to have come from I.C.E., satisfy the scienter element of Relator's FCA claim."[74]

---

[69] *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749 (2023).

[70] *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018).

[71] Fed. R. Civ. P. 9(b).

[72] *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) (citing Fed. R. Civ. P. 9(b)) ("[S]cienter need not be pleaded with particularity, but may be alleged generally.").

[73] Docket 57 at 26; *see also* Docket 57 at 23-24 ("Taken together, these allegations explain how the information moved upward into the annual reports and why Defendants knew about the March 31 no-capital-infusion assessment before the PPP application." (citing Docket 50 at ¶¶ 46, 48-49, 56-58, 87, 107, 120(c)-121)).

[74] Docket 57 at 32.

At the motion to dismiss stage, a relator may "allege facts supporting a plausible inference of scienter."[75] While Relator seeks to draw an inference that the Pt Arctic Fund's March 31, 2020 financial information was known to Defendants when they submitted the PPP loan application,[76] he does not rely on conclusory statements. The Amended Complaint "identifies two channels of [Defendants'] knowledge[:]"[77] Mr. Short and Mr. Bourdon.[78] According to Relator, Mr. Short "linked I.C.E. to the Fund's ownership and reporting chain by serving on I.C.E.'s board while holding the Chief Executive Officer role on the side of the Manager and the Fund."[79] And Mr. Bourdon "linked I.C.E. back into that same chain by running I.C.E. for 35 years, signing the PPP application, and participating in the discussions and analysis that produced the March 31, 2020, bombshell statement."[80] Relator maintains these allegations "support the inference that the 2019 Annual Report reflected I.C.E.'s own information and contemporaneous assessment, not detached third-party commentary."[81]

---

[75] *Winter*, 953 F.3d at 1122 (citing *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 997 (9th Cir. 2011)).

[76] Docket 50 at ¶¶ 46, 48-49, 56-58, 87, 120(c)-121; Docket 66-1.

[77] Docket 57 at 23.

[78] Docket 50 at ¶¶ 46-47.

[79] Docket 57 at 23.

[80] Docket 57 at 23.

[81] Docket 57 at 23 (citing Docket 50 at ¶¶ 14(c)-(g), 46, 49, 56–58, 87, 106-09, 120(c)-121).

Relator cites to Ninth Circuit authority for the proposition that "top management claiming to be unaware of such obvious inferences" is an "absurd" result.[82] Here, Relator maintains that because Mr. Short "sat on I.C.E.'s board and communicated portfolio-company information to the Manager" and that Bourdon participated "in the discussions that produced the March 31, 2020, no-capital-infusion assessment," it is reasonable to infer that Defendants were aware of the information about I.C.E. contained in the Fund's annual reports.[83]

In their reply, Defendants assert that "[a]s a matter of law (and logic), Relator cannot attribute any of the third-party's knowledge, statements, or actions to Defendants."[84] Defendants also contend that knowledge may only be imputed when there is an agency relationship for purposes of making a FCA claim, and the

---

[82] Docket 57 at 27-28 (first citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 942-43 (9th Cir. 2003); then citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008); and then citing *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)). Although these cases arose under the Private Securities Litigation Reform Act ("PSLRA"), which requires a plaintiff to plead facts giving rise to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A), that standard is more demanding than Rule 9(b), which permits knowledge to be alleged generally.

[83] Docket 57 at 17, 20; *see also* Docket 57 at 26 ("[T]he Amended Complaint does not treat the 2019 Annual Report as disconnected third-party commentary. It alleges that I.C.E.'s financial data in the annual reports came from I.C.E.").

[84] Docket 60 at 18.

Amended Complaint makes no allegation of an agency relationship.[85] However, Defendants do not cite to any applicable authority that requires an agency relationship to exist in order to impute Mr. Short's and Mr. Bourdon's knowledge to I.C.E. Rather, the Court finds the "core operations" doctrine as set forth in *Reese*, *Berson*, and *America West* applicable.[86] Under that doctrine, a court can impute scienter based on the inference that key officers—such as Mr. Short and Mr. Bourdon—"have knowledge of the 'core operations of the company.'"[87]

The Court finds that, at the motion to dismiss stage, the Amended Complaint adequately alleges that both Mr. Short and Mr. Bourdon had knowledge of I.C.E.'s financial condition when the PPP application was filed, and that knowledge can be imputed to both Defendants. Specifically, as to Mr. Bourdon, the Amended Complaint plausibly alleged that "Defendant Bourdon materially participated in these meetings and in rigorous analysis with Pt Capital . . . and agreed that a

[85] Docket 60 at 19 (citing *United States ex rel. N. Star Terminal & Stevedore Co. v. Nugget Constr., Inc*., 445 F. Supp. 2d 1063, 1071 (D. Alaska 2006) ("[A]n agency relation exists only if there has been a manifestation of the principal to the agent that the agent may act on his account and consent by the agent to so act.")). However, *Nugget Construction* is inapplicable, as that case concerned whether an agency relationship existed between the principal and an undisclosed third-party for the performance of a service contract, and not whether scienter has been adequately pled in an FCA case. 445 F. Supp. 2d at 1070.

[86] *See Reese*, 747 F.3d at 575; *see also America West*, 320 F.3d at 942-43 (holding that plaintiff "provide[d] sufficient and particularized factual allegations that TPG and its officers knew about the maintenance and operational problems and the misstatements made by America West's officers" in alleging that "[t]wo TPG officers . . . served as members of America West's Board of Directors," the officers attended "71% and 65% respectively" of eleven board meetings, and one officer was "a member of the Executive Committee" and the other "served as one of the four directors on the Compensation Committee").

[87] *See Reese*, 747 F.3d at 574.

capital infusion was not necessary, relying on his (then) nearly 35 years of experience owning and running I.C.E. Services."[88] Further, viewing the relevant facts in the light most favorable to Relator, Mr. Short's summaries of I.C.E.'s financial situations support at least a reasonable inference of Defendants' scienter.[89]

In light of Rule 9(b)'s relaxed requirement that knowledge may be pled generally, the Court finds that both Count 1 and Count 2 of the Amended Complaint adequately allege that Defendants knowingly, or with deliberate ignorance or reckless disregard, made the allegedly false Economic Necessity Certification.[90]

**c. Element Three: Materiality**

In the prior order granting Defendants' first motion to dismiss, this Court found that Counts 1 and 2 of the Complaint failed to allege any allegations as to materiality.[91] Relator has cured this deficiency in the Amended Complaint.[92] But Defendants now maintain that the Amended Complaint only "allege[s] a formulaic

---

[88] Docket 50 at ¶ 58.

[89] *See America West*, 320 F.3d at 941. Defendants' arguments as to Relator's "information and belief" are to no avail. Docket 60 at 7. "Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9, . . . the pleader is not required to allege facts that are 'peculiarly within the opposing party's knowledge,' and allegations 'based on information and belief may suffice,' 'so long as the allegations are accompanied by a statement of facts upon which the belief is founded.'" *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) (quoting *Wool*, 818 F.2d at 1439).

[90] Docket 57 at 22.

[91] Docket 49 at 17.

[92] *See* Docket 50 at ¶¶ 110, 122.

recitation of the element of materiality, which falls well short of meeting the 'demanding' standard" set forth by the Supreme Court.[93]

"[T]he [FCA] defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"[94] "Under the Act, the misrepresentation must be material to the other party's course of action. But . . . statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment."[95] As recently explained by the Supreme Court in *Escobar*, the existence of a certification does not by itself conclusively establish materiality.[96]

As alleged in the Amended Complaint, the SBA's Frequently Asked Questions ("FAQ") suggest that the Economic Necessity Certification is indeed "central" to the PPP application. Between the date Defendants' PPP loan was approved, April 11, 2020, and the date the funds were disbursed, April 30, 2020, the SBA published FAQ 31 on April 23, 2020 and FAQ 37 on April 28, 2020.[97]

---

[93] Docket 54-1 at 33; *see Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) [hereinafter *Escobar*] ("The materiality standard is demanding.").

[94] *Escobar*, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(4)).

[95] *Id.* at 191 (citing *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 39 (2011) (holding materiality cannot rest on "a single fact or occurrence as always determinative")).

[96] *Id.* at 194 (footnote omitted).

[97] Docket 50 at ¶¶ 25, 27; U.S. SBA, PPP Loans, FAQs (as of May 13, 2020), https://legacy.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf, at 12 (Question 37). The Amended Complaint erroneously states that Question 37 was published on April 29, 2020. Docket 50 at ¶ 28.

FAQ 31 clarified that borrowers must consider "their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."[98] FAQ 37 extended this requirement to private companies.[99] FAQ 31 also provided a safe harbor provision "under which any borrower that applied for a PPP loan before April 23, 2020, and repaid the loan in full by May 7, 2020, would be deemed by the SBA to have made the necessity certification in good faith."[100]

Relator alleges that the Economic Necessity Certifications were "material conditions of eligibility and payment under the CARES Act and SBA PPP rules. . . . Further evidence that the certifications were material comes from the PPP Loan Necessity Questionnaire required by SBA for borrowers who obtained $2+ million in PPP funds," which I.C.E. completed and submitted.[101] The Amended Complaint also alleges that had the United States known the "true financial condition" of I.C.E., it "would not have approved the PPP loan in the first place, would not have

---

[98] Docket 50 at ¶ 25 (citing U.S. SBA, PPP Loans, FAQs (as of May 13, 2020), https://legacy.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf, at 11 (Question 31)).

[99] Docket 50 at ¶ 28 (citing U.S. SBA, PPP Loans, FAQs (as of May 13, 2020), https://legacy.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf, at 12 (Question 37)).

[100] Docket 50 at ¶ 27. This safe harbor provision was subsequently extended to May 18, 2020. *See* U.S. SBA, PPP Loans, FAQs (as of May 9, 2024), https://legacy.sba.gov/sites/default/files/2024-05/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-73%20%28FINAL%205-9-24%29%20508.pdf, at 15 (Question 31).

[101] Docket 50 at ¶ 110.

permitted I.C.E. Services to retain the funds beyond the safe-harbor period, and would not have granted forgiveness."[102]

Relator cites to three post-*Escobar* Ninth Circuit cases as examples of cases that "turn on allegations that the government would have denied claims or applications had it known the defendants intended not to comply with applicable rules."[103] Relator first cites to *Barnes*, but does not include the first sentence of the quoted paragraph, which states:

> Although Relator has not "nudged [her] claims . . . across the line from conceivable to plausible" for the purposes of defending a motion to dismiss under Fed. R. Civ. P. 12(b)(6), *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quotations omitted), this does not mean her pleading as to materiality was "clearly frivolous" under 31 U.S.C. § 3730(d)(4). Relator did allege materiality: that Defendants promised to comply with certain laws, regulations, and guidance to obtain grant funding that "*they would not otherwise have been able to obtain.*" Moreover, it is conceivable that the government would deny a grant application if it learned that the applicant intended not to comply with the federal rules that the applicant certified it would abide by in its grant application.[104]

The unpublished *Barnes* opinion has limited persuasive effect, because there, the relator failed to meet Rule 12(b)(6)'s plausibility standard, let alone Rule 9(b)'s particularity standard. Rather, the Ninth Circuit held only that the relator's

---

[102] Docket 50 at ¶ 122.

[103] Docket 57 at 40-41 (first citing *Barnes v. Clark County*, Case No. 21-15137, 2022 WL 73052, at *4 (9th Cir. Jan. 7, 2022); then citing *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838, 846 (9th Cir. 2022); and then citing *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1021 (9th Cir. 2018)).

[104] *Barnes*, 2022 WL 73052, at *4 (emphasis in original).

materiality allegations were not "clearly frivolous" under the FCA's attorneys' fee provision.[105]

Relator next cites to *Kinetic Concepts*. Although that case was decided on summary judgment, the Court finds the Ninth Circuit's analysis regarding materiality persuasive. There, the relator alleged that a medical device manufacturer had falsely certified compliance with certain Medicare coverage criteria.[106] The Circuit Court held that "[i]n the context of a false certification of compliance with a regulatory or statutory requirement for payment, the certification is material if the requirement is 'so central to the claims that the government would not have paid these claims had it known' that the requirement was not satisfied."[107]

Relator also cites *Stephens Institute*, in which the Ninth Circuit expressly applied the *Escobar* materiality standard. In that case, the relators alleged that an art university had falsely certified compliance with the Higher Education Act's incentive compensation ban—which prohibits paying recruiters bonuses tied to success in securing enrollments—while drawing federal student aid funds under Title IV.[108] In affirming the district court's denial of the defendant's motion for summary judgment, the Ninth Circuit held that the defendant had failed to

---

[105] *Id.* (citing 31 U.S.C. § 3730(d)(4)).

[106] *Kinetic Concepts, Inc.*, 44 F.4th at 841-42, 846.

[107] *Id.* at 846 (citing *United States ex rel. Winter v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1121 (9th Cir. 2020)).

[108] *Stephens Inst.*, 909 F.3d at 1016-17.

"establish[] as a matter of law that its violations of the incentive compensation ban were immaterial."[109]

For purposes of a motion to dismiss, the Court agrees with Relator that the SBA's FAQs 31 and 37, and the required initialing of the Economic Necessity Certification are indicative that the SBA considered this certification to be material to its decision to loan PPP funds to I.C.E. Stated differently, it is reasonable to infer that the SBA would not have issued the loan had Defendants not initialed the Economic Necessity Certification box. Further, the Court agrees with Relator that the amount of I.C.E.'s PPP loan is also indicative of materiality. As the Ninth Circuit held in *Stephens Institute*, "[a] reasonable trier of fact could find materiality here because the Department's payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities, and because of the substantial size of the forbidden incentive payments."[110] On May 13, 2020, the SBA also advised PPP borrowers of its intent to review each loan greater than or equal to $2 million to determine whether the

[109] *Id.* at 1015, 1020.

[110] *Id.* at 1020.

borrower had an adequate basis for making the required necessity certification.[111] In light of the prominence of the Economic Necessity Certification on the PPP application, the requirement to initial the certification, and the FAQ guidance, the Court finds that the Amended Complaint adequately pleads that the Economic Necessity Certification was material.

There is no dispute that I.C.E. received the PPP loan. Therefore, Relator has adequately alleged Element Four—that the government paid out the money to I.C.E.[112]

Rule 9(b) "does not require absolute particularity or a recital of the evidence."[113] "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations."[114] For the foregoing reasons, the Court finds that Counts 1 and 2 as pled in the Amended Complaint adequately allege the elements

---

[111] Docket 50 at ¶ 29 (citing U.S. SBA, PPP Loans, FAQs (as of May 13, 2020), https://legacy.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_05%2013%2020_2.pdf, at 16 (Question 46)). FAQ 46 was later "deleted on July 29, 2021, due to the discontinuance of the use of the Loan Necessity Questionnaire (SBA Form 3509 or 3510)." U.S. SBA, PPP Loans, FAQs (as of May 9, 2024), https://legacy.sba.gov/sites/default/files/2024-05/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-73%20%28FINAL%205-9-24%29%20508.pdf, at 21 n.57 (Question 46).

[112] *See Erskine*, 182 F.4th at 791.

[113] *United Healthcare*, 848 F.3d at 1180.

[114] *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (citations omitted); see also *United Healthcare*, 848 F.3d at 1180 ("Thus, '[p]erhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) . . . is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading.'") (citation omitted).

of an FCA claim and false certification claim. Accordingly, Defendants' motion to dismiss is **DENIED** as to Counts 1 and 2.

### II. Count 3 (Reverse FCA Claim)

Count 3 of the Amended Complaint alleges that after I.C.E. received the PPP loan proceeds in April 2020, it improperly retained the funds past the SBA's May 18, 2020 safe harbor repayment deadline.[115] Relator contends that "the Amended Complaint alleges that after the SBA clarified the necessity standard, I.C.E. neither withdrew its approved loan before disbursement nor repaid the funds after disbursement, despite knowing its internal financial condition and liquidity did not support the Economic Necessity Certification."[116] The Amended Complaint alleges that the "obligation for [I.C.E.] to repay the Government arose under the SBA's April 23, 2020 guidance which required borrowers to return their PPP funds to the Government by May 18, 2020 if they were unable to meet the economic uncertainty certification requirements."[117]

The reverse false claims provision of the FCA is violated when someone "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an

[115] Docket 50 at 35, ¶¶ 143–44 ("I.C.E. incurred an 'obligation,' within the meaning of 31 U.S.C. § 3729(b)(3), to return those funds to the United States.").

[116] Docket 57 at 44 (citing Docket 50 at ¶¶ 121, 142-45).

[117] Docket 50 at ¶ 144.

obligation to pay or transmit money or property to the Government."[118] The FCA defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."[119]

Defendants assert that (1) "the reverse FCA cause of action is redundant of Counts One and Two" and (2) Count 3 fails to adequately allege an "obligation to repay the Government."[120] Defendants contend that Count 3 is merely an "attempt to turn the so-called safe harbor opportunity offered by the SBA into an immediate, legal, and specific obligation to repay the PPP loan."[121]

"An 'obligation to pay' is indeed an essential element of an FCA action for fraudulently avoiding paying money to the government."[122] Here, the Amended Complaint fails to adequately allege that repayment of the loan constitutes an "obligation" as defined by the applicable statute.[123]

---

[118] 31 U.S.C. § 3729(a)(1)(G).

[119] 31 U.S.C. § 3729(b)(3).

[120] Docket 54-1 at 36, 38.

[121] Docket 54-1 at 15.

[122] *Island Indus., Inc. v. Sigma Corp.*, 151 F.4th 1003, 1016 (9th Cir. 2025) (citing 31 U.S.C. § 3729(a)(1)(G)).

[123] 31 U.S.C. § 3729(b)(3) ("[T]he term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.").

While Relator cites Fifth Circuit authority in support of his "retention of an overpayment" argument,[124] the Court will apply the Ninth Circuit's analysis set forth in *Lesnik* and *Sigma*.[125] The plaintiffs in *Lesnik* alleged that the defendants violated the FCA by fraudulently applying for employment visas for the plaintiffs that cost less than the ones for which the defendants should have applied.[126] The district court dismissed the plaintiffs' reverse false claims, reasoning that "even if the defendants should have applied for the more expensive visas, they did not do so, and therefore had no legal obligation to pay for such visas" and concluded that a mere potential liability contingent upon a finding that they violated applicable regulations in applying for the wrong visas was not an "established duty" to pay the government, as required by the FCA.[127] The Ninth Circuit affirmed the district court, holding that because the FCA "requires an established legal obligation, it [was] not sufficient that defendants applied for the wrong visas or may face liability for violating applicable regulations. They had no 'established duty' [under 31 U.S.C. § 3729(b)(3)] to pay for visas for which they did not apply."[128]

---

[124] Docket 57 at 44-45 (quoting *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1036 (5th Cir. 2016)).

[125] *United States ex rel. Lesnik v. ISM Vuzem d.o.o.*, 112 F.4th 816 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1171 (2025); *Sigma Corp.*, 151 F.4th at 1003.

[126] *Lesnik*, 112 F.4th at 818.

[127] *Id.* at 818.

[128] *Id.* at 819-20.

By contrast, in *Sigma*, the Ninth Circuit held that the plaintiff's reverse FCA claim could proceed. There, the plaintiff alleged that the defendant made two types of false statements on customs forms to evade antidumping duties in violation of the FCA.[129] The Ninth Circuit explained that "[a] plaintiff bringing such a claim must show that the United States 'was owed a specific, legal obligation at the time that the alleged false record or statement was made.'"[130] The Circuit continued: "Under the FCA, an 'obligation' means 'an established duty [to pay], whether or not fixed,' arising from a statute or regulation (among other sources)."[131] The Ninth Circuit held that the defendant in *Sigma* "became liable for antidumping duties when it imported its welded outlets from China," where the "liability was an 'obligation' under the FCA at the time of the welded outlets' arrival" into the United States under the antidumping duties statute at issue.[132]

Here, like in *Lesnik*, there was no "obligation," i.e. no "established duty" to pay "arising from a statute or regulation" "at the time that the alleged false record or statement was made."[133] While FAQ 31 established a safe harbor repayment deadline in May 2020,[134] the Amended Complaint does not allege that at the time

---

[129] *Sigma Corp.*, 151 F.4th at 1011.

[130] *Id.* at 1016 (quoting *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008)).

[131] *Id.* (alteration in original) (quoting 31 U.S.C. § 3729(b)(3)).

[132] *Id.* at 1016–17 (citing 31 U.S.C. § 3729(b)(3)).

[133] *Sigma Corp.*, 151 F.4th at 1016 (citations omitted) (quoting 31 U.S.C. § 3729(b)(3)).

[134] Docket 50 at ¶¶ 27, 82.

Defendants completed the Economic Necessity Certification, and in the weeks that followed, I.C.E. had an established duty to repay the PPP loan that is distinct from Counts 1 and 2. Accordingly, the Court finds that Count 3 fails to state a claim upon which relief can be granted, and Defendants' motion to dismiss is **GRANTED** as to Count 3.

### III. Leave to Amend

Under Rule 15(a), a court "should freely give leave when justice so requires."[135] "But a district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."[136] A court's "discretion to deny leave to amend is particularly broad where the plaintiff has previously amended the complaint."[137] A plaintiff's repeated failure to cure a complaint's deficiencies constitutes "a strong indication that the [plaintiff has] no additional facts to plead" and "any attempt to amend would be futile."[138]

---

135 Fed. R. Civ. P. 15(a)(2).

136 *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

137 *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 582 (9th Cir. 2019) (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990)); *see also Williams v. California*, 764 F.3d 1002, 1018-19 (9th Cir. 2014) ("The fact that Plaintiffs have already had two chances to articulate clear and lucid theories underlying their claims, and they failed to do so, demonstrates that amendment would be futile." (internal citation omitted)).

138 *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (citation and quotation marks omitted).

Because Relator has already been afforded an opportunity to amend the complaint and no set of facts could be added by amendment to Count 3 that could state a cognizable reverse FCA claim against I.C.E., allowing leave to file an amended complaint as to Count 3 would be futile. Accordingly, Relator's Amended Complaint as to Count 3 must be dismissed with prejudice and without leave to amend.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Relator's Amended Complaint at Docket 54 is **GRANTED in part and DENIED in part** as follows:

1. Defendants' Motion to Dismiss is **DENIED** as to Counts 1 and 2;
2. Defendants' Motion to Dismiss is **GRANTED** as to Count 3; Count 3 of Relator's Amended Complaint is **DISMISSED with prejudice**; and
3. Defendants shall file an Answer responsive to Counts 1 and 2 **within fourteen (14) days** from the date of this order.[139]

DATED this 30th day of September, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

[139] *See* Fed. R. Civ. P. 12(a)(4)(A) ("[I]f the court denies the motion . . . , the responsive pleading must be served within 14 days after notice of the court's action").